# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | |
|---|---|
| United States of America<br>v.<br><br>LIONELL COLEMAN<br><br>*Defendant(s)* | )<br>)<br>) Case No. 1:24-MJ-00377<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of August 29, 2023 to May 20, 2024 in the county of Hamilton in the
Southern District of Ohio, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21, U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846 | (1) Conspiracy to possess with intent to distribute, and distribute, 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, and 400 grams or more of a mixture or substance containing a detectable amount of fentanyl; and (2) distribution of 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, and 400 grams or more of a mixture or substance containing a detectable amount of fentanyl |

This criminal complaint is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

SA Gregory Price, DEA
*Printed name and title*

Sworn and subscribed to before me by reliable electronic means, specifically, FaceTime video conference, pursuant to Fed. R. Crim. P. 4.1.

Date: May 20, 2024

_____
*Judge's signature*

City and state: Cincinnati, Ohio    Hon. Stephanie K. Bowman, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF A CRIMINAL COMPLAINT AND ARREST WARRANT FOR: LIONELL COLEMAN | Case No.   1:24-MJ-00377<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF A CRIMINAL
COMPLAINT AND ARREST WARRANT**

I, Gregory M. Price, being duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of a criminal complaint and arrest warrant for Lionell COLEMAN charging him with: (1) conspiracy to possess with intent to distribute, and distribute, 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, and 400 grams or more of a mixture or substance containing a detectable amount of fentanyl, a Schedule II controlled substance, in violation of Title 21, U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846; and (2) distribution of 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, and 400 grams or more of a mixture or substance containing a detectable amount of fentanyl, a Schedule II controlled substance, in violation of Title 21, U.S.C. §§ 841(a)(1) and 841(b)(1)(A).

2. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510 (7) of Title 18, United States Code, that is, an officer of the United States who is empowered by the law to conduct investigations of, and to make arrests for, the offenses enumerated in Title 18, United States Code, Section 2516.

    a. I am a Special Agent ("SA") of the Drug Enforcement Administration ("DEA") and have been employed since December 2018. I also serve as a Chief Warrant

1

    Officer UH60 Blackhawk Pilot for the Ohio Army National Guard and have been in the Ohio Army National Guard for more than eighteen years. I graduated from Army Basic Training, Army Flight School, Southern New Hampshire University, and the DEA Basic Agent Academy. As a DEA special agent, my duties and responsibilities include conducting criminal investigations for violations of federal law, particularly those found in Title 21 and Title 18 of the United States Code. As a DEA agent, I have participated in several federal criminal investigations seeking evidence of violations of the Federal Controlled Substances Act (Title 21 of the United States Code).

b. I am currently assigned to the Cincinnati District Office of the DEA. I received specialized training from the DEA, including the 18-week Basic Agent Training course. That training focused on methods of unlawful drug trafficking; the identification of controlled substances; surveillance; undercover operations; confidential source management; the means by which drug traffickers derive, launder, and conceal their profits from drug trafficking; the use of assets to facilitate unlawful drug trafficking activity; and, the law permitting the forfeiture to the United States of assets purchased with drug proceeds or assets used or intended to be used to facilitate the drug violations.

c. As a DEA Agent, I have participated in all aspects of drug investigations, including physical surveillance, installation and monitoring of GPS devices, execution of search warrants, arrests of drug traffickers, and Title-III wiretap investigations. I have participated in the execution of numerous search warrants seeking evidence of violations of the Federal Controlled Substances Act (Title 21 of the United States Code). These warrants covered the search of locations such as residences of drug traffickers and their coconspirators/associates, drug manufacturing operations, and stash houses used as storage and distribution points for controlled substances. I have also participated in the execution of search warrants for electronic devices and information, such as search warrants for mobile telephones, and GPS tracking devices.

d. By virtue of my involvement in these investigations, I have become familiar with the various means and mechanisms used by drug traffickers to import and distribute controlled substances and to remain at large without being detected by law enforcement. I am familiar with the fact that drug traffickers make tremendous profits through drug trafficking, and require large amounts of currency to operate surreptitiously. In this regard, I have obtained and executed numerous search warrants in which I have seized ledgers, notebooks, papers, and other related record-keeping instruments, all of which have been used to record multiple narcotics and related money laundering transactions. I have also seized telephone books, diaries, invoices, cellular telephones, and correspondence that contained evidence of narcotic trafficking and money laundering violations.

e. I have been involved in interviewing individuals post-arrest, defendants in conjunction with post-arrest proffers, confidential informants, and other nondefendant individuals with knowledge of illegal drug trafficking. During such interviews and through discussions with other experienced agents, I have become familiar with the day-to-day operations of distributors and transporters of controlled

2

      substances. I have gained knowledge regarding the various methods, techniques, codes, and/or jargon used by illegal drug traffickers in the course of their criminal activities. This includes information about the packaging and preparation of narcotics, methods in which illicit drugs are smuggled, transported, and distributed, and security measures commonly employed by narcotics traffickers. These security measures include the use of firearms to protect their narcotics-related activities, and the use of cellular telephones, pagers, and personal digital assistants to facilitate communications while attempting to avoid law enforcement scrutiny.

    f. As a result of my participation in these and other activities, I have gained particular knowledge in the use of confidential informants, physical surveillance, consensual recordings, investigative interviews, garbage searches, pole-mounted cameras, and GPS tracking devices. Based on my training and experience, GPS tracking devices aid law enforcement in the investigation and detection of illegal drug trafficking by enabling agents to analyze the suspected trafficker's travel patterns. GPS data can aid law enforcement in identifying co-conspirators as well as stash houses, which are residences where contraband and instrumentalities of drug trafficking, such as firearms and drug paraphernalia, are stored.

    g. In addition to using these and other investigative techniques, I have analyzed information from traditional record sources, such as financial records, utility records, and telephone toll and subscriber records. I have also analyzed nontraditional record sources such as the informal ledgers routinely maintained by narcotics traffickers. These informal ledgers, commonly referred to as pay-owe sheets, list amounts of drugs received from sources and distributed to customers and the amounts of money received from customers and owed to sources. I have also gained experience in the identification and collection of drug and non-drug evidence, and the analysis and interpretation of taped conversations obtained by the methods detailed above.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents/officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint/warrant, and does not set forth all of my knowledge about this matter.

4. Based on the facts as set forth in this affidavit, there is probable cause to believe that COLEMAN has committed the following violations of federal law: (1) conspiracy to possess with intent to distribute, and distribute, 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, and 400 grams or more of a mixture or substance containing a detectable amount of fentanyl, a Schedule II controlled

3

substance, in violation of Title 21, U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846; and (2) distribution of 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, and 400 grams or more of a mixture or substance containing a detectable amount of fentanyl, a Schedule II controlled substance, in violation of Title 21, U.S.C. §§ 841(a)(1) and 841(b)(1)(A).

## PROBABLE CAUSE

5. Since at least the summer of 2023, law enforcement has been investigating LIONELL COLEMAN, a high-level distributor of methamphetamine and fentanyl in the greater Southern District of Ohio area. During the course of the investigation, GPS phone location data from COLEMAN's phones (513-879-5137 and 513-915-5656) showed that he regularly travelled to the West Coast to obtain drugs (largely methamphetamine, but also fentanyl), and then mailed them back to the Cincinnati area for distribution. The phone location data also showed that he would then travel to Cincinnati to pick up and distribute the drugs. This includes, but it not limited to, the following:

**August 29, 2023 Interdiction: Thirteen Pounds of Methamphetamine**

6. On or about August 29, 2023, law enforcement in the Cincinnati area intercepted a FedEx package sent overnight from Burbank, California to Cincinnati, Ohio. That parcel was searched pursuant to a search warrant, and found to contain approximately thirteen pounds of methamphetamine inside of a blue five-gallon bucket. The suspected methamphetamine was tested at the Drug Enforcement Administration North Central Laboratory and tested positive for methamphetamine hydrochloride. Law enforcement obtained IP addresses from FedEx showing who was monitoring the parcel during shipment. Law enforcement then sent a subpoena to T-Mobile related to those IP addresses at the relevant times. The subpoena return from T-Mobile

4

showed that a phone used by COLEMAN (513-879-5137) was associated with the phone number tracking the parcel.

### September 28, 2023: Shipment of Suspected Narcotics to Cincinnati

7. On September 27, 2023, Pings for COLEMAN's phone showed COLEMAN travelling to the Paramount Boulevard Exit on California Interstate 60 – a suspected drug pick up location. COLEMAN was there for ten minutes, and the left the area. After that, he drove to a Postal Annex+ location (a packing and shipping company), located at 5280 E Beverly Blvd C Los Angeles, CA 90022. While COLEMAN was there, law enforcement contacted the Postal Annex+ and spoke to an employee, who stated that a black male came into the Postal Annex+ while on the phone, yelling at the employee asking "Has UPS shipped yet?" and that he needed his package to get to Cincinnati, Ohio by noon on September 28, 2023 (the following day). Based on COLEMAN's pings being in the area, and the employee's description of the individual, it appears that person was COLEMAN. COLEMAN provided the Postal Annex+ employee a shipping address of a person with initials M.P., at 3031 Cohoon St Cincinnati, Ohio 45208. COLEMAN also provided a 12"x12"x12" box with no labels that weighed 8lbs. The Postal Annex+ employee notified COLEMAN that this package would not get to Cincinnati by the requested time. COLEMAN then took his package and left in a black Toyota Tundra. The Postal Annex+ employee said COLEMAN was in a rush and displayed nervous behavior during the interaction.

8. On the morning of September 28, 2023, GPS Pings from Coleman's phone showed a location of 10292 Central Ave, Montclair, CA 91763. This is the location of a Fast MailBox Plus store. Agents contacted the Fast MailBox Plus, and the manager stated that a black male came in and requested a shipment of a 12"x12"x12" unlabeled box that weighed 8lbs 6oz, and was destined for 3620 Stettinius Ave, Cincinnati, Ohio. The recipient of the parcel was to be the same

5

M.P. from the parcel COLEMAN attempted to send the previous day. The Fast MailBox Plus manager provided a tracking number of 1ZB796580111087058 for COLEMAN's parcel, and explained that it had already been shipped, with a delivery expected to Cincinnati the next day.

9. On September 29, 2023, agents established surveillance on 3620 Stettinius Ave, Cincinnati, OH. At approximately 9:33 a.m., a FedEx delivery truck parked in front of 3620 Stettinius Ave. At approximately the same time, a black female (later identified as an individual with initials T.G.), exited her black hatchback vehicle with Ohio plate JVV5005 (registered to T.G.). T.G. spoke with the FedEx driver, but left that conversation with nothing in hand, and returned to her vehicle. At approximately 9:40 a.m., Agents stopped and spoke with the FedEx driver, who stated that T.G. was asking if the driver had a package for the same "M.P." that COLEMAN had shipped his package to the previous day.

10. At approximately 9:50 a.m., a UPS delivery truck pulled up to 3620 Stettinius Avenue. T.G. then exited her vehicle and spoke with the UPS driver. She was given a package by the UPS driver, entered her car, and drove away. Shortly thereafter, agents spoke with the UPS driver, who confirmed that T.G. asked if he/she had a package for the same "M.P." which the UPS driver then provided to T.G. The UPS driver confirmed that, for the package provided to T.G., the intended recipient was M.P., at 3620 Stettinius Avenue, with confirmation number 1ZB796580111087058. This is the same parcel that COLEMAN shipped from California the prior day. Agents then surveilled T.G. as she drove to 728 Betton St., Cincinnati, Ohio. This is the listed address for T.G. T.G. exited the car, removed the package from the trunk, and entered her home.

**October 16, 2023: Shipment of Suspected Narcotics to Cincinnati**

11. On October 16, 2023, pings for COLEMAN's phones showed that he was in the area of a Postal Annex located at 18032 Lemon Drive Ste C, Yorba Linda, California 92886.

6

Agents contacted management from Postal Annex, and management notified Agents that a person that matched the description of COLEMAN was present at the Postal Annex on the same date and time as his phones pings. COLEMAN had dropped off a parcel with sender information: M&L Fabrics LLC, 4421 Camela St., Yorbia Linda, CA 92886. That parcel had recipient information of: M.W., 245 Wedgewood Ave, Cincinnati, Ohio 45217.

12. On October 17, 2023, law enforcement observed a UPS box truck arrive and park in front of 245 Wedgewood Ave, Cincinnati, Ohio. At approximately 10:16 a.m., a unknown black male black (UM1), wearing a highlighter vest and jeans, walked to the front porch of 245 Wedgewood Ave. and grabbed the package that was dropped off by the UPS driver. UM1 placed the package inside a trash can in front of the house located on the street curb. At approximately 10:32 a.m., a silver Ford Focus bearing Ohio temporary license RZ05390 (registered to J.K.W.) parked in front of 245 Wedgewood Avenue. An unknown black female (UF1) exited the front driver's door and walked to the same trash can where the parcel was placed. UF1 grabbed the same parcel that was placed inside by UM1. UF1 then got back into the Ford Focus with the package and departed. At approximately 10:35 a.m., UF1 drove to 719 Greenwood Ave, Cincinnati, Ohio, got out of the vehicle, retrieved the package from the vehicle, and placed the package inside of the trash can in front of 719 Greenwood Avenue. At approximately 10:40 a.m., a unknown male (UM2) wearing a black hooded sweatshirt and jeans, exited from front door of 720 Greenwood Ave with nothing in hand. UM2 then walked over to the same trashcan where UF1 had deposited the parcel in front of 719 Greenwood Avenue. UM2 retrieved the same parcel from the trashcan, and then walked back into 720 Greenwood Avenue with the parcel in hand. UM2 was later identified as D.S., who was listed as a resident of 720 Greenwood Avenue.

**October 2023: Controlled Call to COLEMAN**

13.     During the last weeks of October 2023, the CS placed a controlled call to COLEMAN with law enforcement on the line. Per COLEMAN's phone pings, he was in Los Angeles, California at the time. COLEMAN answered the phone and notified the CS that "ice" (methamphetamine) was $175.00 per ounce. COLEMAN told the CS that, if the CS was into it, COLEMAN had "slow" (fentanyl/heroin) for $400.00 a half ounce. COLEMAN told the CS to contact him when the CS was ready to purchase.

**November 2023: Controlled Purchase of Four Ounces of Meth Arranged by COLEMAN**

14.     During the month of November 2023, the CS, with law enforcement present, contacted COLEMAN via text message to purchase of four ounces of methamphetamine for $700. COLEMAN directed the CS to an address in Cincinnati, Ohio (the "Apartment Complex") to conduct the drug transaction. On the same date, the CS travelled to the Apartment Complex as COLEMAN had instructed. There, the CS met with an unknown black male who provided the CS with four ounces of methamphetamine for $700 – as arranged by COLEMAN. The suspected methamphetamine was tested at the Drug Enforcement Administration North Central Laboratory and tested positive for methamphetamine hydrochloride.

**November 29, 2023: COLEMAN Ships Fentanyl and Meth to Cincinnati**

15.     On December 1, 2023, law enforcement officers were conducting parcel interdiction efforts at the Federal Express (FedEx) parcel sorting facility located at 7150 Paddock Road, Cincinnati, Ohio 45216. Agents located a suspicious parcel, bearing tracking number: 7871.9307.7068, which was addressed to T.S. at 1606 Marilyn Lane, Cincinnati, Ohio 45231. This parcel will be referred to as the "7068 Parcel." The 7068 Parcel had the sender listed as H.W., at 5850 West 3rd Street Suite E, Los Angeles, California 90036. The parcel weighed approximately

8

17.34 pounds and was in a 17" x 13" x 13" box. A drug dog alerted positively on the box for the presence of narcotics, and law enforcement then obtained a warrant to search the box. The box was searched, and found to contain (confirmed by lab tests):

    a. Fentanyl, blue round pills with the markings M/30 on them. Approximately 5,114 Unit Doses, weighing 624 grams in packaging.
    b. Fentanyl, orange round pills with the markings M/30 on them. Approximately 873 Unit Doses, weighing 196 grams in packaging.
    c. Methamphetamine, containing approximately 5,426 (5.4 kilograms) grams in packaging.

16. Agents contacted management with Box City in California, and requested (via subpoena) surveillance footage from November 29, 2023 (the date the 7068 Parcel was shipped). COLEMAN's phone pings showed that he was at Box City that day (2056 Westwood Blvd, LA). Box City provided footage, which showed COLEMAN in the store carrying a large Tupperware with blue handles, and requesting a box to package it. The Tupperware container and packaging materials that COLEMAN carried into and out of the Box City on November 29, 2023 appears to be the same Tupperware found inside the 7068 Parcel seized on December 1, 2023.

**November 29, 2023: Coleman with Tupperware at Box City**




9

**7068 Parcel Contents**





**December 14, 2023: COLEMAN Ships Methamphetamine to Cincinnati**

17. On December 14, 2023, the pings for COLEMAN's phone showed that he was at the Box City located at 2056 Westwood Blvd, Los Angeles, CA 90025. Later, his phone pings went to the area of a FedEx Office Print & Ship Center located at 5591 E. 7th Street, Long Beach, CA 90804. While the pings showed COLEMAN was present at the FedEx, agents spoke with an employee at that location, who advised there was a male subject matching the physical description of COLEMAN in the store. FedEx stated the male subject paid cash to ship a package weighing approximately five pounds to Cincinnati, Ohio (two-day shipping).

18. Later, agents contacted management with Box City and requested (via subpoena) surveillance footage from December 14, 2023, for around the COLEMAN's phone was in the area of Box City. The footage was provided, and showed COLEMAN arriving at the store carrying two Tupperware containers with two gray colored lids, along with his cell phone. COLEMAN was observed handing the Tupperware containers to the desk employee for measurement purposes. The employee then provided what appeared to be two different boxes to COLEMAN and COLEMAN put the Tupperware inside one of the boxes to see how it fit.

19. Agents also submitted a subpoena to FedEx requesting all records relating to deliveries/shipments from that location to Cincinnati, Ohio and Miami, Florida. FedEx provided agents the tracking number for the package sent by COLEMAN from the FedEx shipping center to Cincinnati, which was 788046089060. This parcel will be referred to as the "9060 Parcel."

20. On December 15, 2023, agents arrived at the FedEx facility located at the Cincinnati/Northern Kentucky International Airport (CVG) in an attempt to locate the 9060 Parcel sent by COLEMAN via FedEx. A drug canine indicated positively on the 9060 Parcel for the presence of drugs. The parcel was addressed to a location in Cincinnati. Law enforcement then

obtained a federal search warrant for 9060 Parcel. Upon executing the search warrant, law enforcement found that the 9060 Parcel contained a Tupperware container that matched one of the two[1] Tupperware containers COLEMAN was observed bringing into Box City on December 14, 2023. Agents removed the lid of the Tupperware container and located three vacuum sealed bags of a crystalline substance. The markings on the inner box appear to be the same markings on the box(es) provided to COLEMAN from Box City. Video surveillance from Box City displays what appears to be the same markings on the boxes provided to COLEMAN from the store.

**December 14, 2023: COLEMAN with Tupperware at Box City**



**9060 Parcel with Meth Interdicted on December 15, 2023**



---

[1] A Tupperware container matching the other container was later interdicted on January 11, 2024, in Columbus, Ohio. It was found to contain methamphetamine. This incident is described below.

21. On December 19, 2023, agents observed Coleman Phone 2 ping in the area of the address of the intended recipient of the 9060 Parcel. Based on my training and experience, I believe that COLEMAN was checking the location to see if the 9060 Parcel was delivered.

22. On December 20, 2023, agents weighed all three vacuum sealed bags of crystalline substance which weighed approximately 1.59 kilograms, and field tested one of the three vacuum sealed bags of crystalline substance, which tested positive for methamphetamine. The suspected methamphetamine was tested at the Drug Enforcement Administration North Central Laboratory and tested positive for methamphetamine hydrochloride.

### HIDTA Columbus Controlled Delivery on January 11, 2024

23. On January 11, 2024, Cincinnati agents were notified by Central Ohio HIDTA Drug Task Force that they seized a FedEx parcel shipped from Los Angles, California to Columbus, Ohio (the "Columbus Parcel"). They obtained a state search warrant authorizing the search of the Columbus Parcel. During the search of the parcel, officers discovered that the parcel housed a Tupperware container holding two vacuumed sealed bags that each contained a zip-loc bag of a crystal-like substance, along with dryer sheets. The crystal-like substance was field tested on a MX908 device, and was positive for methamphetamine. The approximate weight of the two zip-loc bags of crystal methamphetamine was two pounds. The suspected methamphetamine was tested at the Drug Enforcement Administration North Central Laboratory and tested positive for methamphetamine hydrochloride. After searching the parcel, law enforcement in Columbus attempted a controlled delivery of the parcel (re-packaged with sham drugs) to the intended recipient.

24. During the controlled delivery, to 1526 Myrtle Ave, Columbus, OH 43211, COLEMAN was observed pulling up to the address in a dark grey Hyundai Sonata, with Ohio

plate KFN4896 (Enterprise Rental). COLEMAN then got out of the vehicle, walked up to the front porch of 1526 Myrtle Ave, retrieved the Columbus Parcel, placed the parcel into the back seat of the Hyundai Sonata, entered the driver side seat, and left the area. Pictures of that retrieval are set out below:

 

25. COLEMAN then was observed traveling on I-71 south toward Cincinnati, OH, when surveillance was lost on COLEMAN and, eventually, terminated. License Plate Readers showed that COLEMAN's Sonata arrived in the Cincinnati area around 2:30 p.m. that same day (January 11, 2024).

26. On January 12, 2024, Agents took custody of the parcel and the methamphetamine from the Central Ohio HIDTA Drug Task Force. While agents processed the parcel and its contents, they were able to confirm that the Tupperware container seized from the parcel matched the Tupperware container COLEMAN brought into the Box City on December 14, 2023 (as described above). Those parcels are pictured below:

14

**COLEMAN and Tupperware at Box City on December 14, 2023**



**January 11, 2024: Columbus Parcel Contents**



27. On January 17, 2024, agents observed the pings from COLEMAN's phone in the area of Dania Beach, Florida. His pings stayed in the same area until at least February 10, 2024. Agents believe COLEMAN was staying in Florida to avoid contact with law enforcement in the State of Ohio – after the controlled delivery.

**March 2024: CS Purchases Methamphetamine from Lionell COLEMAN[2]**

28. Towards the end of March 2024, the CS, with law enforcement present, contacted COLEMAN to place an order for sixteen ounces of methamphetamine for $1,600. COLEMAN

---

[2] The exact dates of the controlled purchase are known to law enforcement, but are not being specifically set out herein in order to protect the CS's identity.

15

agreed for the CS to meet with COLEMAN for the illegal drug transaction. Later that day, COLEMAN met with the CS at a pre-determined location in the Cincinnati area. During their interaction, COLEMAN threw a gray plastic bag into the CS's vehicle which contained sixteen ounces of methamphetamine. The suspected methamphetamine was tested at the Drug Enforcement Administration North Central Laboratory and tested positive for methamphetamine hydrochloride. The CS paid COLEMAN $1,600. The CS later confirmed to law enforcement that COLEMAN was the one who conducted the drug transaction. This transaction was audio/video recorded.

### April 2024: CS Purchases Methamphetamine from COLEMAN

29. During the beginning of April 2024, the CS, with law enforcement present, contacted COLEMAN to set up a purchase of twelve ounces of methamphetamine for $1,500. COLEMAN agreed to meet the CS for the deal at a location in the Cincinnati area. Later that same day, the CS met with COLEMAN at the pre-determined location and purchased twelve ounces of methamphetamine for $1,500. The suspected methamphetamine was tested at the Drug Enforcement Administration North Central Laboratory and tested positive for methamphetamine hydrochloride. The CS later confirmed that it was in fact COLEMAN who provided the twelve ounces of meth to the CS that day. This transaction was audio/video recorded.

### May 2024: CS Purchases Methamphetamine COLEMAN

30. During the beginning of May 2024, the CS, with law enforcement present, contacted COLEMAN and COLEMAN agreed to sell the CS methamphetamine. COLEMAN provided the CS an address in the Cincinnati area to meet for the deal. The CS travelled to that location, met with COLEMAN, and purchased approximately seven ounces of methamphetamine.

The CS confirmed that it was COLEMAN who provided the CS the methamphetamine that day. This transaction was audio/video recorded.

### **Conclusion**

31. Based on evidence obtained as a result of this investigation, as described above, there is probable cause to believe that COLEMAN has committed the following violations of federal law: (1) conspiracy to possess with intent to distribute, and distribute, 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, and 400 grams or more of a mixture or substance containing a detectable amount of fentanyl, a Schedule II controlled substance, in violation of Title 21, U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846; and (2) distribution of 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, and 400 grams or more of a mixture or substance containing a detectable amount of fentanyl, a Schedule II controlled substance, in violation of Title 21, U.S.C. §§ 841(a)(1) and 841(b)(1)(A).

*[Intentionally Blank]*

## REQUEST FOR SEALING

32. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

_____
Gregory M. Price
Special Agent
Drug Enforcement Administration

Subscribed and sworn to me by reliable electronic means, specifically, FaceTime video conference, pursuant to Fed. R. Crim. P. 4.1, on May __20__, 2024.

_____
Honorable Stephanie K. Bowman
United States Magistrate Judge